BLACKSTONE CANAL CO. (McDOWELL v.). See Case No. 8,777.

BLACK WARRIOR, The (GREYOR v.). See Case No. 5,807.

BLACK WARRIOR, The (TURNER v.). See Case No. 14,253.

---

## Case No. 1,474.

### BLACKWELL et al. v. ARMISTEAD.

[3 Hughes, 163; 5 Am. Law T. 85; Browne, Trade-Marks, 510 (2d Ed. 638); Cox, Manual Trade-Mark Cas. 220.]

Circuit Court, W. D. Virginia. March Term, 1872.

TRADEMARKS—ENJOINING USE OF—WHAT WILL BE CONSIDERED ON APPLICATION FOR PRELIMINARY INJUNCTION—"DURHAM"—ACTUAL USE—IMITATION—FRAUD—WHAT CHARGES OF WILL BE CONSIDERED.

[1. On application for a preliminary injunction to enjoin the use of a trademark, the only question proper to be considered by the court is whether or not the facts presented by the bill, as affected by ex parte affidavits assailing the title of complainant, are sufficient to justify the stay, and it is improper on such an application to pass on the merits of the defense.]

[2. A tobacco manufacturer using as a brand "Best Spanish Flavored Durham," in 1860, has no priority of trademark over another manufacturer in Durham, N. C., using, in 1865 or 1866, as the distinguishing mark of his goods, the words "Genuine Durham Smoking Tobacco," where the proof shows that, as to the early claims, the words "Best Spanish Flavored" were the distinguishing attribute, and the word "Durham," under the circumstances at the time, but a mere unmeaning incident.]

[3. It is only the actual use of a mark, device, or symbol by the dealer which entitles him to, and gives him the right to be protected in, the enjoyment of it as a trademark.]

[4. The words "The Durham Smoking Tobacco," in connection with the head of a bull as a symbol, are such an imitation of a trademark consisting of the words "Genuine Durham Smoking Tobacco," with the side figure of a bull as a symbol, that their use will be enjoined as an infringement.]

[5. Infringement may consist in an imitation, though not amounting to forgery, yet so close as to deceive an unwary customer.]

[See McLean v. Fleming, 96 U. S. 245; Walton v. Crowley, Case No. 17,133; Humphreys' Specific Homeopathic Medicine Co. v. Wenz, 14 Fed. 250.]

[6. Charges of fraud and falsehood concerning the use of words and symbols claimed as a trademark are not sustained by mere argument and ridicule.]

[7. Distinguished in Blackwell v. Dibrell, Case No. 1,475, on the question of estoppel.]

[In chancery. Bill by W. T. Blackwell and J. S. Carr, partners under the style of W. T. Blackwell, against L. L. Armistead to enjoin infringement of a trademark. Perpetual injunction granted, and accounting ordered.]

RIVES, District Judge. The preliminary injunction in this case was founded on the statements in the bill. In pursuance of the notice required by statute the defendant contested its emanation upon ex parte affidavits assailing the title of the plaintiffs. But in that incipient state of the proceedings it would not have been proper, if at all practicable, to pass upon the merits of their defence; and the only question there was, whether the case as presented by the bill and affected by this adverse testimony, was still such as to require this stay till the merits of the controversy could be developed by further pleading and testimony. The propriety of this interposition by the court will scarcely be now questioned, as these further proceedings have shown the case to be one of perplexity and doubt.

The pleadings have now been perfected. The defendant's answer was duly filed, issue taken upon it, and the cause set down for final hearing. A vast volume of testimony has also been taken, some of it contradictory, and a vast deal of it irrelevant and impertinent. It is to be regretted that the zeal of counsel or the anxiety of parties should have so augmented the bulk of this testimony as to make a needlessly expensive record of it, and to devolve upon all engaged in its examination a wearisome amount of unprofitable reading. Still it is a subject of congratulation that the cause is now fully developed in all its aspects and bearings, and has been argued with a discriminating force and fulness of research alike masterly and instructive, and calculated to produce settled convictions one way or the other.

Our first task is to acquire accurate and precise ideas of the issues made by the pleadings. If this be done, and then the law be properly applied, it seems to me we can reach a safe conclusion almost without resorting to the voluminous testimony. The plaintiffs claim a trademark, designed in 1865 or 1866, and continuously used ever since. It is exemplified and made a part of their bill. The descriptive terms are "Genuine Durham Smoking Tobacco," and the symbol or device is the side view of a Durham bull. They assert that this trademark has been violated by the defendant in using, under date of January, 1871, these terms: "The Durham Smoking Tobacco," and the symbol or device of "a bull's head," with a note of the sale to the defendant of Wright's patent for the manufacture of "Genuine Durham Smoking Tobacco." This latter trademark of the defendant is also exemplified in the bill and placed in juxtaposition and contrast with the plaintiffs' trademark.

The answer, while calling for full proof of the allegations of the bill, does not directly deny this statement, but rests the defence upon three chief grounds: 1. The prior use of this trademark by Wright (under whom the defendant claims) as far back as 1860. 2. That the defendant's trademark is not an infringement of the plaintiffs, but is wholly dissimilar; and, 3. That the plaintiffs, by fraudulent representations in the premises,

have deprived themselves of all equitable assistance.

The main contest is considered by all parties and the counsel in this case to rest on the priority in the use of this disputed trademark. The defendant does not pretend that Wright, under whom he claims, ever used the identical trademark set up by the plaintiffs. On the contrary, he takes especial pains to show that he placed no particular value on the term "Durham," which he now asserts belongs in common to his and plaintiffs' brands. The discovery which he had made, and for which he seeks protection, was his preparation for a mode of treating smoking tobacco, so as to mitigate its noxious qualities and impart to it an agreeable flavor. This is the merit he claims; this the process he has patented. The testimony and the answer concur in proving that the whole merit of this smoking tobacco, and its celebrity, were due to the use of the flavoring he gave his tobacco. He was confessedly the first to commence its manufacture at Durham's Station. There was nothing in the locality he could have reasonably counted upon to commend his manufacture to the public. But, if we are to credit the defendant's answer and his testimony in this cause, it was his discovery of the flavoring compound on which he plumed himself. Accordingly, it was this which he emblazoned on his stencil-plate. Take his own statement for the present, and what was his brand? "Best Spanish Flavored Durham Smoking Tobacco." What, in view of the pleadings and evidence in this cause, is the characteristic, the vital element of this trademark? Manifestly, "Best Spanish Flavored." That was the only conspicuous and discriminating element in the trademark. "Durham," if indeed a part of it, was, upon the defendant's own showing, subordinate and insignificant. Now, the plaintiffs concede in the fullest manner Wright's superior title to the use and brand of his flavoring compound, and disclaim in their process any infringement of it; nor does it appear there has been any, nor, indeed, any formal complaint of it.

The pretension of the defendant, then, amounts to this: that because, in 1860, he branded his smoking tobacco "Best Spanish Flavored Durham," wholly because of the mode in which he flavored it, no subsequent manufacturer of the article at Durham, without the use of his process, shall brand his as "Genuine Durham Smoking Tobacco" with a symbol which he never used. Their reply is that, under the circumstances of his use of the name "Durham," there was nothing in it so descriptive as to restrain succeeding manufacturers at the same place from engrafting it on their brand, so long as they laid no claim to nor made any use of his "Best Spanish Flavored" compound, which he, indeed, appropriated by this first and original use of this only conspicuous term on

his stencil-plate in 1860–61. It must be remembered that Wright was only in the infancy of this manufacture at Durham, and that others followed and developed it till the plaintiffs instituted their brand in 1865 or 1866.

Conceding, then, all the defendant claims by virtue of his purchase from Wright, he fails, in my opinion, to rebut the plaintiffs' title by proving a brand as used by Wright previously, wherein "Best Spanish Flavored" was the distinguishing attribute, and "Durham," under the circumstances at that time, a mere unmeaning incident. Thus stands this point in the light of the pleadings alone, the allegations of the plaintiffs on the one hand, and the denials and defences of the defendant on the other.

The testimony as to the fact whether the term "Durham" was ever upon the stencil-plate of Morris & Wright is contradictory. But in my mind it preponderates against the existence of that name in that brand. Counsel have adroitly insisted that the testimony against it is negative, and cannot from its nature, however commanding, overcome clear affirmative proofs. The proposition of law involved in the statement is correct; but the whole inquiry is into a fact, namely, What was the stencil used by Morris & Wright? Some, on the one hand, who had used it, declare with emphasis it was "Morris & Wright's Best Spanish Flavored Smoking Tobacco;" others, but mainly Wright and his two sons—the latter at the time but boys —stated it as "Morris & Wright's Best Spanish Flavored Durham Tobacco." The proofs, therefore, on both sides are equally affirmative. If, then, it be left in doubt, we must look to the probabilities of the case to turn the scales. What motive could have existed with Wright, all whose reliance was upon the merits of his flavoring compound, to invoke the name of a small, thriftless station on a railroad, settled by only two or three families, with a store and this factory, to invoke its name to give celebrity to the preparation to which he solely looked for his reward? It seems to me extremely improbable, upon ordinary grounds of reason and human action, to suppose that he used "Durham" on his stencil at all. On comparing and weighing the testimony on both sides, I am constrained to adopt the conclusion that he did not. Neither he nor his vendee, therefore, have any claim to contest, under this state of the evidence, the validity of the plaintiffs' trademark and their original and paramount title thereto.

It cannot be denied that it is abundantly proven in this cause, that the manufacture of Morris & Wright, and of those who succeeded them at Durham, was known, called, and distinguished in the market as "Durham" smoking tobacco. It is on this notorious fact in the cause that the able and ingenious argument has been raised that the public, by its voice, may appropriate and consecrate to an

individual property in a designation by which he may choose to denote any product of his industry. But I can find no warrant for such proposition in the law on this subject. On the contrary, it is distinctly laid down by the authorities, that it is only the actual use of the mark, device, or symbol by the dealer which entitles him to it, and gives him the right to be protected in the enjoyment of it.

The doctrine on this subject has grown with commerce, and has assumed the form and title of a distinct body of law under the moulding hand of able judges, who have sought in their decisions to establish its guiding principle, and of acute commentators and essayists, who have exerted the powers of a superior analysis and discrimination to extricate from doubt the true maxims of this beneficent code of business ethics.

So much of it as is necessary for our present inquiry is comprehended in a single proposition. It is the seminal principle of the whole doctrine. The simple statement of it is, that the dealer has property in his trademark. This is allowed him because of the right which every man has to the rewards of his industry and the fruits of his discovery, and because of the wrong of permitting one man to use as his own that which belongs to another. In regard to the latter, it may be well said that any imitation of a trademark, calculated to deceive the unwary customer, differs from an absolute forgery, not in the nature, but rather in the extent of the injury. The dissimilarity to the expert wholesale dealer may be such as to save him from the imposition, but too slight, and that perhaps by design, to diminish sales to the incautious purchaser. But upon the success of fraud depends, ultimately, the extent of the injury. Let the spurious fabrication meet the same sale among private and individual consumers as the genuine article, and the wholesale dealer loses all motive for the exercise of his skill in detection, when he, perhaps, can reap better profits from the spurious, and therefore cheaper, than from the genuine article. In this way a simulated trademark may work the same mischief, and to the same extent as a forgery, defying detection at the hands of the expert.

With this view of the law I proceed to examine the second ground of defence, that the defendant has not infringed the trademark of the plaintiffs. This is scarcely the subject of argument. It must be referred to ocular examination and decision. Place the respective trademarks side by side, contrast the labels, the words, and the devices, and each one's vision must determine for himself whether the imitation is such as to deceive the unpracticed and unwary customer. It matters not now, in the critical inspection of them, and aided by ingenious counsel, we can clearly discern differences between the two. The true question is, whether, taking the "tout ensemble," Armistead's trademark might not pass with the unwary for that of

William T. Blackwell & Co.; and if that be so, the wrong is done, and the title of the latter to be protected by this court is consummated. For my part, I do not see how trademarks so similar could escape being confounded in the market. One reads, "Genuine Durham Smoking Tobacco;" the other, "The Durham Smoking Tobacco." This use of the definite article makes these phrases equivalent. To remove all doubt, and aid the deception, in the note of the sale of the patent to Armistead, it reads. for "Genuine Durham Smoking Tobacco." Thus the language, to this extent, of the label is identical. Now, as to the symbols, or devices; one is the side view of the Durham bull; the other, that of his head, on a medallion. The one symbolizes, by a part, the name "Durham" as effectually as the other does by the whole. The color of the paper is also the same. Whether this simulation be the product of accident or design does not matter. It is the province of this court to suppress it in either case. It is a little curious, however, to note that Wright's first label, at Liberty or in Bedford, was wholly different; and that after his son had seen plaintiffs' trademark in Kentucky, and after his return to his father, the present trademark, as transferred to the defendant, was adopted by Wright.

The third and last ground of defence is that the plaintiffs have forfeited their right to relief in this court by reason of their false and fraudulent pretensions. This is upon the ancient and familiar principle that those who do iniquity must not ask nor expect equity. It is worthy of all acceptation. It is a hoary maxim, hallowed by its age, and, unlike some other sacred antiquities, as yet unassailed by the spirit of change or reckless progress; I adhere to it. But the charges are serious and demand investigation.

The first is that the plaintiffs sent out business envelopes and business cards, giving the year 1860 as the date of the establishment of their enterprise. In the absence of explanation this might well impugn the bona fides of the plaintiffs, as in their bill they fix it no earlier than 1865. But was this statement by mistake or design? Have the plaintiffs failed to account for it? A junior member of the firm was examined, and showed how it all occurred innocently, and without intent to deceive. He ordered the printing and gave the date; soon after the packages were received and opened in the presence of Dr. Blackwell. The latter saw the error of date and corrected it; and the witness stated that he proceeded to correct the misdate by writing the figure (5) over the cipher in 1860, so as to make the date 1865, as corrected by Dr. Blackwell, but that some might have gone out before the correction. The exhibits made by the defendant of these envelopes and cards corroborate rather than conflict with the witness. That should not be taken for fraud which is proved by an unimpeached witness to have been a mistake on his part.

Besides there was no reasonable motive for such misrepresentation; the plaintiffs had nothing to gain by it, but much to lose, on the hypothesis of the counsel for the defendant.

The next is a charge of falsehood in representing that the label was secured by copyright. There is not a particle of proof to that effect. Argument and ridicule alone are relied upon to show the inapplicability and absurdity of a copyright for such a print. The language of the statute is certainly comprehensive enough to embrace a label of this kind. Act July 8, 1870, § 86 (16 Stat. 212). The object of such copyright is to secure to "the author, inventor, or designer" of any such "print" the sole liberty of printing and vending the same. It forbids the surreptitious use and illegal sale of his labels. This is a perfectly legitimate resort to copyright in such a case and for such a purpose. It would, indeed, be absurd and ridiculous if the object were, as sarcastically portrayed by counsel, to protect the designer against the unlawful multiplication of such ycleped works of art. The dealer seeks merely by his copyright to keep the printing and vending of his labels in his own hands and under his control. It has been resorted to in other cases, as, for instance, the case of Wolfe v. Goulard, Cox, Trade-Mark Cas. 227, for the label of "Schiedam Schnapps." There is nothing unreasonable or incredible in this claim of the plaintiffs to a copyright for their label, nor is there anything in the testimony or the law to lead us to discredit it and brand it as a falsehood.

It seems to me, therefore, that both these charges are unfounded. They spring from the heat of forensic contests. They pertain to the polemics of the bar. Their effect is to provoke recrimination. Hence, the plaintiffs' counsel retaliate by imputing falsehood to the defendant in dating this purchase of Wright 1st of January, when he had stated in his answer he would not buy till he had ascertained his title by certificates, and those very certificates bore the subsequent date of the 6th of that month. The imputation seems plausible, but the transaction is susceptible of a more charitable construction, which I deem it my duty to put upon it. Dates are commonly immaterial, and often misapplied in business transactions. The main fact is doubtless correctly stated by the defendant, though he is made himself to confront it by a mistaken date.

I am glad, therefore, to have it in my power to state that there is nothing in this cause to affect the fair fame of the parties plaintiff or defendant. They are doubtless respectable men, and enterprising manufacturers of tobacco in their respective communities. They are engaged, as I believe, in the honest pursuit of their rights as they respectively understand them. The defendant has acted on the information of another, under whom he claims. He has obeyed the order of this court. The only thing I have to regret is, that the same deference was not paid by another manufacturer, who, though no party to this suit, could not have been ignorant of it from his near relation to the defendant. But the plaintiffs have not chosen to bring him before this court, save by proving his acts in the use of the simulated mark, notwithstanding the injunction upon his brother.

I am sure the plaintiffs and defendant, as enterprising dealers, will find their ultimate interests subserved by the doctrine I have sought to expound and maintain as to their trademarks. Whoever may now be the loser by it may soon have occasion to invoke it for his own protection, and they whose rights are now sustained, must learn thereby to respect those of other competitors in their business, at the same time that they take encouragement to themselves from their present success. All intelligent men engaged in manufactures and other enterprises must sooner or later become reconciled to losses in whatever favored quarter they may fall, that may be fairly viewed as penalties for the infraction, however unintentional, of laws well settled, designed, and calculated to vindicate the honor, advance the morals, and promote the interests of trade.

For these reasons I declare the perpetuation of the injunction, and order an account to be taken by a master of the profits made by the defendant from his sales under the simulated trademark aforesaid.

[NOTE. For another case involving this trademark, see Blackwell v. Dibrell, Case No. 1,475.]